# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-3570

_____

United States of America

*Plaintiff - Appellee*

v.

Lamar Bertucci

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 14, 2015
Filed: July 23, 2015

_____

Before WOLLMAN, SMITH, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Lamar Bertucci pleaded guilty to killing a bald eagle and a rough-legged hawk, in violation of 16 U.S.C. §§ 668(a), 703, and 707. The district court sentenced Bertucci to a total of eight months' imprisonment, imposed a $6,500 "financial obligation," and additionally imposed a condition of supervised release that requires Bertucci to participate in anger-management counseling. Bertucci appeals the district

court's sentencing decisions, arguing that the district court procedurally erred in its application of the Guidelines, lacked authority to issue the "financial obligation," and abused its discretion by requiring anger-management counseling. For the reasons stated herein, we vacate Bertucci's sentence and remand for resentencing.

## I. *Background*

In early 2014, a grand jury returned an indictment against Bertucci charging him with shooting and killing a bald eagle and a rough-legged hawk, in violation of 16 U.S.C. §§ 668(a), 703, and 707. Bertucci pleaded guilty to the offenses, and the district court ordered the preparation of a presentence investigation report (PSR).

The PSR concluded that Bertucci had a criminal history score of two and that his total offense level was ten. The PSR incorporated a four-level enhancement under Guidelines §§ 2Q2.1(b)(3)(A)(ii) and 2B1.1(b)(1)(C) on the basis that the total "loss" amounts for the eagle and hawk exceeded $10,000 but did not exceed $30,000.[1] The PSR also incorporated a two-level enhancement under Guideline § 2Q2.1(b)(1)(B) for a "pattern of similar violations" because Bertucci was convicted in 2009 for possession of bald eagle feathers, in violation of § 668(a). In discussing Bertucci's alleged prior criminal conduct, the PSR also included several paragraphs focusing on previous assaults that Bertucci had allegedly committed.

Bertucci objected to both enhancements, as well as to the allegations of assault. Bertucci's objections focused on the PSR's allegedly erroneous $10,000 valuation of the bald eagle. In that regard, Bertucci emphasized that both the government *and* the district court had adopted a mere $2,000 valuation for bald eagles in the 2009 prosecutions of both him and his brother. Bertucci also focused on the PSR's allegations of assault, which Bertucci asserted were factually baseless. As Bertucci

---

[1]The PSR assessed the replacement cost for the bald eagle at $10,000 and the replacement cost for the hawk at $1,750.

noted in his objections, charges relating to the assault allegations were either dismissed or never filed at all.

The district court ultimately denied Bertucci's objections and sentenced him to a total of eight months' imprisonment with one year of supervised release. The court imposed a special condition of supervised release that requires Bertucci to "attend, successfully complete, and pay for any diagnostic evaluations and treatment or counseling programs for anger management [to include a domestic violence component or a batterer's awareness program as deemed necessary] as directed by the probation officer." (Emphasis omitted.) In addition, the court imposed a "financial obligation" on Bertucci "in the amount of $5000.00 for the eagle and $1500.00 for the hawk for a total amount of $6500.00."

## II. *Discussion*

Bertucci argues on appeal that the district court committed multiple procedural errors with respect to its application of the Guidelines. Bertucci also argues that the $6,500 "financial obligation" was, in reality, an order for restitution, which the district court lacked authority to order in this case. Finally, Bertucci argues that the district court had an insufficient factual basis to require anger-management counseling.

In reviewing Bertucci's sentence, we "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range." *Gall v. United State*s, 552 U.S. 38, 51 (2007). If the district court committed no procedural error, we then "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Id.* Similarly, "[w]e review the district court's imposition of the terms and conditions of supervised release for an abuse of discretion." *United States v. Boston*, 494 F.3d 660, 667 (8th Cir. 2007) (citing *United States v. Heidebur*, 417 F.3d 1002, 1004 (8th Cir. 2005)).

A. *Guidelines*

Bertucci argues that the district court erred by adopting "a flawed valuation process" to value the eagle at $10,000 and the hawk at $1,750. As a result of the district court's valuations, it applied a four-level sentence enhancement under §§ 2Q2.1(b)(3)(A)(ii) and 2B1.1(b)(1)(C), which jointly prescribe a four-level enhancement for offenses involving wildlife with a "market value" exceeding $10,000.

Critically, with respect to the "market value" of the wildlife, Application Note 4 to § 2Q2.1 clarifies that:

> When information is reasonably available, "market value" . . . shall be based on the fair-market retail price. Where the fair-market retail price is difficult to ascertain, the court may make a *reasonable estimate* using any *reliable information*, such as the reasonable replacement or restitution cost or the acquisition and preservation (e.g., taxidermy) cost.

(Emphasis added.) Thus, even assuming there was no "reasonably available" information to determine the "fair-market retail price" of the bald eagle and rough-legged hawk (which the district court implicitly found), substitute estimates must nevertheless be "reasonable" and based on "reliable information." With this procedural safeguard in mind, we now analyze the reliability of the valuation-related evidence in the record before us.

As Bertucci emphasizes on appeal, the United States Fish and Wildlife Service has prepared a Fish, Wildlife & Plant Valuation Table ("Valuation Table") that identifies the "replacement value" of eagles as $2,500[2] and the "replacement value" of hawks as $350. Notably, the District of Nebraska (the district court in this case)

---

[2]At the time Bertucci was prosecuted in 2009, the then-current version of the Valuation Table identified the replacement value of eagles as $2,000.

has specifically adopted the Valuation Table to establish the replacement values of various types of birds—including eagles and hawks. *See* D. Neb. General Order 05-01, Sched. D at 20.[3] Furthermore, both the district court *and* the government have relied on the Valuation Table to specifically value bald eagles; in 2009, for instance, they used the Valuation Table to value bald eagles in prosecutions against Bertucci and his brother.

The government has failed to explain how the value of eagles could have *quintupled* between 2009 (when the government and court adopted the Valuation Table's then-current valuation of $2,000) and 2014 (when the government initiated this prosecution). To the contrary, Ellen Goeckler, a Special Agent with the United States Fish and Wildlife Service who testified at the sentencing hearing, acknowledged that bald eagles were recently "taken off the endangered species list" and that we can properly "assume that their populations are growing."

Nevertheless, instead of once again relying on the Valuation Table, both the PSR and court chose to rely on valuations found in an affidavit submitted by Edward Clark, Jr., President of the Wildlife Center of Virginia. Clark's affidavit, in sum, concludes that the "reasonable replacement costs" for bald eagles and rough-legged hawks are $10,000 and $1,750, respectively.

Clark's valuations, of course, differ drastically from both valuations in the Valuation Table and valuations that the government and district court have adopted in similar cases. But these wide discrepancies are not the only issues that cast doubt

---

[3]We also note that various federal courts have adopted wildlife and plant valuation tables containing numbers similar to those in the Valuation Table. *See, e.g.*, E.D. Tex. General Order 01-02, Exh. B., App. A at 21 ($1,000 for eagles; $500 for hawks); W.D. La. Standing Order 1.846 at 16 ($1,000 for eagles; $250 for hawks); W.D. Tex. Rule CR-58(c), Exh. C, App. A at A-2 ($1,000 for eagles; $500 for hawks).

on the affidavit's reliability; indeed, a careful examination of the affidavit reveals additional infirmities. For instance, the affidavit itself suggests that Clark may have structured his analysis and inflated his valuations to comport with his own beliefs that, as a legal policy matter, a bird's replacement value should be deemed to exceed the bird's average rehabilitation costs. As Clark averred:

> In considering replacement cost within the context of illegal activity, I feel strongly that the ultimate determination of that cost should not inadvertently create an incentive to kill the affected birds rather than to simply displace or injure them. . . .
>
> *Therefore*, even in the absence of a comparable market value or propagation cost upon which to base the replacement value of dead birds, a determination of reasonable restitution payments can be reached by *beginning* with the average cost to properly care for, rehabilitate and release to the wild an individual bird of the affected species . . . . *Then*, this cost basis can be adjusted to account for [other] factors . . . .

(Emphasis added.) Of course, Clark may be right that ensuring replacement costs generally exceed average rehabilitation costs constitutes good policy. But his proper role in submitting the affidavit was limited to assessing the true valuation of the eagle and hawk per the Guidelines—not assessing what valuations would constitute sound legal policy. *See* § 2Q2.1(b)(3)(A).

We also note that, after making the above policy statement, Clark's affidavit discusses assorted numbers ranging from a mere $475 (the purported market price of a kestrel in Great Britain) all the way up to $50,000 (the estimated price to propagate and release a California Condor) before "subjectively factoring in" eagles' and hawks' "scarcity" and "role[s] in the ecosystem" to arrive at his final estimated "replacement costs." Critically, much of the information contained in his analysis is derived from Clark's alleged conversations with third parties. Certain of these conversations occurred more than two decades ago. We further note that the affidavit leaves unclear

whether Clark was *even present* at certain of the exchanges, making it impossible to discern, for instance, how Clark learned of the information or how reliable the information is.[4]

In light of the foregoing considerations, Clark's valuations (adopted by the government) do not constitute sufficiently reliable evidence to justify the new and dramatically increased eagle and hawk valuations proffered in this case.[5] *See* U.S.S.G. § 2Q2.1 cmt. n.4.

## B. *Financial Obligation*

Whether the district court erred in imposing the $6,500 "financial obligation" depends on whether that obligation is properly understood as restitution or a fine. Indeed, it is undisputed on appeal that the court had authority to issue a fine; however, the court generally did *not* have authority to order restitution for Bertucci's offenses.[6] *See* 18 U.S.C. §§ 3663 and 3663A (authorizing restitution for various crimes but not for violations of 16 U.S.C. §§ 668(a), 703, or 707); *United States v.*

---

[4]Indeed, in contrast with the affidavit's description of a 1988 conversation in which Clark specifies "I spoke" with the third party, Clark avoids making such affirmative representations with respect to 2006 conversations and does not even represent that he witnessed the conversations.

[5]Because we vacate Bertucci's sentence, we need not address his arguments about a two-level pattern enhancement and the court's discussion of the Guidelines during sentencing.

[6]Of course, the district court had authority to order restitution either as a condition of probation, *see* 18 U.S.C. § 3563(b)(2), or as a condition of supervised release, *see* 18 U.S.C. § 3583(d), but chose neither option in this case. We also note that in *United States v. Oliver*, this court affirmed a district court's sentence of "two years probation and $5,000 restitution" for the defendant's violations of 16 U.S.C. § 668(a). *See* 255 F.3d 588, 589 (8th Cir. 2001) (per curiam). *Oliver* is inapposite here, however, given that the defendant in *Oliver* did *not* challenge the district court's authority to order restitution and we therefore did not address the issue.

*Love*, 431 F.3d 477, 479 (5th Cir. 2005) ("A federal court cannot order restitution 'except when authorized by statute.'" (quoting *United States v. Bok*, 156 F.3d 157, 166 (2d Cir. 1998)).

In analyzing whether the "financial obligation" is tantamount to either restitution or a fine, we note at the outset that:

> "If the oral sentence is ambiguous, our task is to discern the court's intent." [*United States v. Olson*, 716 F.3d 1052, 1056 (8th Cir. 2013)]. If we find such an ambiguity, then we look to "'the entire sentencing pronouncement,' including the written record," to determine the district court's intent. *Id.* [(quoting *United States v. Buck*, 661 F.3d 364, 374 (8th Cir. 2011)).] "There is no dispute that ambiguities in the sentence pronouncement are to be construed in favor of the defendant." *Buck*, 661 F.3d at 374 (quotation omitted).

*United States v. Thomas*, 757 F.3d 806, 809 (8th Cir.) (per curiam), *as corrected* (July 8, 2014).

A close examination of the sentencing hearing transcript reveals that the court intended to order restitution—not a fine. We note, for instance, that the government specifically requested during the hearing that the court impose "some restitution in this case." Shortly thereafter, when the court announced Bertucci's sentence, the court specified that the "financial obligation" was "*[i]n lieu of a fine*." (Emphasis added.) And, although the court later referred to the financial obligation in passing as a "fine," the court further characterized the financial obligation as an "assessment for the loss of the eagle and the hawk"—"in the amount of $5,000 as far as the eagle is concerned and $1500 as far as the hawk is concerned."

The government is correct that the court later characterized the financial obligation as a "fine" in its written judgment. Nevertheless, as the government also

concedes, "when an oral sentence and the written judgment conflict, the oral sentence controls." *United States v. Mayo*, 642 F.3d 628, 633 (8th Cir. 2011) (per curiam) (citing *United States v. Foster*, 514 F.3d 821, 825 (8th Cir. 2008)).

Consequently, we hold that the "financial obligation" is, in fact, restitution, which the court lacked authority to order in the context of the specific charges filed in this case.[7] We note, however, that "the district court may consider" on remand whether to order "restitution as a condition of [Bertucci]'s supervised release." *United States v. Dean*, 64 F.3d 660, 1995 WL 493006, at *4 (4th Cir. Aug. 18, 1995) (per curiam).[8]

---

[7]The government additionally contends that we should apply the deferential plain-error standard of review to affirm the district court's decision. After all, according to the government, Bertucci did not argue during the sentencing hearing that the court lacked statutory authority to impose restitution in this case. Bertucci *did* argue, among other things, that the court could not "provide restitution to nature." Nevertheless, even if plain error review governed our analysis of this issue, we would find that the court committed plain error by issuing restitution without authority to do so. *See United States v. Poitra*, 648 F.3d 884, 887 (8th Cir. 2011) ("To obtain relief under a plain-error standard of review, the party seeking relief must show that there was an error, the error is clear or obvious under current law, the error affected the party's substantial rights, and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." (citing *United States v. Curry*, 627 F.3d 312, 314–15 (8th Cir. 2010) (per curiam)); *United States v. Clark*, 274 F.3d 1325, 1328–29 (11th Cir. 2001) (per curiam) (holding that a district court committed plain error by imposing a sentence in contravention of statutory requirements); *United States v. Barajas-Nunez*, 91 F.3d 826, 833 (6th Cir. 1996) ("Permitting sentencing courts to disregard governing law would diminish the integrity and public reputation of the judicial system.").

[8]We further note that, if the district court chooses to order restitution as a condition of supervised release, the court may rely on the Valuation Table to determine the replacement values of the eagle and the hawk.

## C. *Counseling*

District courts have "broad discretion" in fashioning special conditions of supervised release, provided those conditions "meet the requirements of 18 U.S.C. § 3583(d)." *United States v. Davis*, 452 F.3d 991, 994 (8th Cir. 2006) (citing *United States v. Andis*, 333 F.3d 886, 893 (8th Cir. 2003) (en banc)).

> Section 3583(d) first requires that the condition be "reasonably related" to the nature and characteristics of the offense and the defendant, the deterrence of criminal conduct, the protection of the public from any further crimes of the defendant, and the defendant's correctional needs. 18 U.S.C. §§ 3583(d)(1), 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D); *United States v. Crume*, 422 F.3d 728, 732–33 (8th Cir. 2005). Second, the condition must not involve any "greater deprivation of liberty than is reasonably necessary" to advance deterrence, protect the public from further crimes by the defendant, and promote the defendant's correctional needs. 18 U.S.C. §§ 3583(d)(2), 3553(a)(2)(B), (a)(2)(C), (a)(2)(D). Finally, the condition must be consistent with any pertinent policy statements that the sentencing commission has issued. 18 U.S.C. § 3583(d)(3).

*Id.* at 994–95.

On appeal, the government cites paragraphs 47 and 58 of the PSR, which, according to the government, justify the court's imposition of anger-management

counseling as a special condition of supervised release.[9] Those paragraphs provide, in full, the following:

> 47. The defendant has been arrested for the following offenses in Lancaster and Burt Counties in Nebraska and in the Omaha Tribal Court, of which all charges were dismissed; theft [x2]; failure to appear; DUI [x2]; false statement to police; DUS; escape; assault; criminal mischief [x2]; aggravated assault; simple assault; flight to avoid arrest; possession of a controlled substance; and domestic abuse.

> \* \* \*

> 58. In 2009, the defendant completed the following courses in the Douglas County Jail: Addiction Class; Boundaries; Cognitive Life Choices; HIV Prevention; Reactive Behavior; and Recovery Class.

These paragraphs fail to establish the factual or evidentiary basis necessary to impose anger-management counseling. To be sure, paragraph 47 does contain allegations that, *if* proven true, would support the district court's decision. But paragraph 47 specifically notes that "all" these charges "were dismissed"—meaning the entire paragraph consists of only bare and unproven accusations of misconduct

---

[9]Multiple other paragraphs in the PSR referred to prior assaults that Bertucci allegedly committed. Bertucci objected to the assault allegations, however, and, as the government concedes, "it made no effort to prove up" the allegations in those paragraphs. Consequently, because the district court elected not to hold an evidentiary hearing with respect to those disputed facts, the court could not consider them in fashioning special conditions of supervised release. *United States v. Morehead*, 375 F.3d 677, 679 (8th Cir. 2004) ("When a defendant disputes material facts in his PSR, the sentencing court must either refuse to take those facts into account or hold an evidentiary hearing." (citing *United States v. Delpit*, 94 F.3d 1134, 1154 (8th Cir. 1996))).

from other cases. That alone cannot constitute a sufficient basis for requiring anger-management counseling; after all, "an indictment is simply an accusation. It is not evidence of anything." *United States v. Gammage*, 580 F.3d 777, 779 (8th Cir. 2009) (quotation marks and citation omitted).

With respect to paragraph 58, Bertucci's participation in assorted behavior-related classes five years ago, without more, fails to show that anger-management counseling is now reasonably necessary, or even appropriate. The record is insufficient to support imposition of the condition. The district court neither heard evidence nor made findings with respect to either the content of the classes or why Bertucci attended them. Thus, the special condition is not reasonably related to Bertucci's crime, nor does it address concerns of crime deterrence, public safety, or Bertucci's correctional needs. The condition is therefore vacated.

## III. *Conclusion*

Accordingly, we vacate the district court's sentence and remand for resentencing consistent with this opinion. "As for remand, the government had notice of [Bertucci's] factual objection to the PSR and had fair opportunity to present evidence." *United States v. Webster,* 2015 WL 3634549, at *2 (8th Cir. June 12, 2015). Thus, "[f]ollowing 'the traditional path' of limiting the government to one bite at the apple, the district court on remand may re-sentence . . . only based on the existing record." *Id*. (quoting *United States v. Robinson*, 639 F.3d 489, 498 (8th Cir. 2011); *United States v. Gammage*, 580 F.3d 777, 779 (8th Cir. 2009)).

_____